**Ricky Ray RECTOR, Petitioner,**

v.

**A.L. "Art" LOCKHART, Director Arkansas Department of Corrections, and Steve Clark, Attorney General of the State of Arkansas, Respondents.**

**No. PB–C–84–287.**

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Jan. 3, 1990.

John M. Jewell, Little Rock, Ark., for petitioner.

Jack Gillean, Asst. Atty. Gen., Little Rock, Ark., for respondents.

## ORDER

HENRY WOODS, District Judge.

On March 22, 1981 the petitioner, presently a death row inmate at the Arkansas penitentiary, shot and killed Arthur Criswell and wounded two others at a Conway, Arkansas restaurant. For two days the police searched for Ricky Ray Rector since he was known to be the assailant. A uniformed Conway police officer, Bob Martin, on March 24, 1981 went to the home of Rector's mother. As set forth by the Supreme Court of Arkansas, the following events then occurred:

> While the officer was talking to Rector's mother, sister, and nephew, Rector entered the back of the house and came into the living room. Rector and the officer knew each other and may have exchanged a few words of greeting. Within a few minutes Rector, who had not joined in the conversation, drew a pistol and shot Officer Martin twice. Rector left by the back door and said to his nephew's wife, whom he met crossing the yard: "I just shot that cop." A few moments later Rector attempted suicide by shooting himself in the forehead, the bullet entering the front part of his brain. That evening the wound was surgically cleaned and closed.

*Rector v. State*, 280 Ark. 385, 388, 659 S.W.2d 168 (1983).

Rector was first tried for the murder of Arthur Criswell. Prior to that trial, a hearing was held on September 28, 1981 in response to a motion by Rector's counsel suggesting that Rector was mentally incompetent. On evidence which the Arkansas supreme court characterized as being in "hopeless conflict," the trial judge found that Rector was competent to stand trial. The jury convicted him of first degree murder, and he was sentenced to life imprisonment. The Supreme Court of Arkansas affirmed the conviction. *Rector v. State*, 277 Ark. 17, 638 S.W.2d 672 (1972).

After this affirmance on September 18, 1982, Rector was tried for the capital murder of Officer Martin. Defense counsel again on October 7, 1982 moved for a second hearing to determine Rector's competency. Such a hearing was held on October 25, 1982. Two psychologists, Dr. Douglas Brown and Dr. Douglas A. Stevens, testified on behalf of Rector. Brown had also testified at the competency hearing on September 28, 1981 prior to the trial for the

murder of Criswell. Ron Heller, an attorney for Rector in the Criswell case, also testified in his behalf at both hearings. All three of these individuals testified in the habeas hearing before me, along with Dan Stripling, his attorney in the capital murder trial, and Rector's sister.

At the competency hearing on October 25, 1982, the State adduced testimony from two psychiatrists, Dr. Gregory Kaczewski and Dr. Sayel K. Hamed, and two psychologists, Dr. John Anthony Hall and Dr. Joe Alford. The testimony of all these witnesses is transcribed in Petitioner's Exhibit 9. The testimony is abstracted in Defendant's Exhibit 2. After hearing this testimony, the trial judge again found Rector competent to stand trial. The jury found him guilty, and he was sentenced to death on November 11, 1982.

The competency ruling was one of the issues raised on the appeal of Rector's death sentence to the Supreme Court of Arkansas. In affirming his capital murder conviction, Justice George Rose Smith wrote for a unanimous court:

A second argument for reversal is that the trial judge should have found Rector incompetent to stand trial against the death penalty. A parallel question of competency was decided adversely to Rector on his earlier appeal from his conviction for the murder of Arthur Criswell. *Rector v. State,* 277 Ark. 17, 638 S.W.2d 672 (1982). The proof in the two cases is quite similar, although in this case a witness for the State, Dr. Hamed, thought that Rector's condition was much improved as compared to the time Dr. Hamed saw Rector soon after his surgery.

The expert proof is in sharp conflict, as it was on the other appeal. It is argued, however, that it takes a higher degree of competency to defend against the death penalty; so the two appeals are distinguishable. No doubt the issues may be more extensive in a death case, in which aggravating and mitigating circumstances are involved, but we do not discern any basis in the testimony for relating Rector's mental condition to the defense

of a capital charge in particular. We must conclude, as we did on the earlier appeal, that the trial judge's decision is not clearly erroneous.

*Rector v. State,* 280 Ark. 385, 397, 659 S.W.2d 168 (1983). The Supreme Court of the United States denied certiorari. *Rector v. Arkansas,* 466 U.S. 988, 104 S.Ct. 2370, 80 L.Ed.2d 842 (1984).

In his original habeas corpus petition, Rector raised a number of issues later abandoned. He then filed an amended petition in which the lone contention was an absence of the requisite mental capacity to be put to death by the State of Arkansas, *citing* ACA § 5–2–302:

No person who, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist effectively in his own defense shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures.

Amended Petition for Writ of Habeas Corpus at 13. Rector also claims that his Eighth Amendment rights would be violated by his execution.

Since the habeas petition requested that he be given a mental examination, I sent him to the federal correction facility at Springfield, Missouri for a complete psychiatric evaluation. The reports concerning Rector's evaluation are contained in Petitioner's Exhibits 1–7, received by agreement.

A hearing on Mr. Rector's habeas petition was noticed on October 10, 1989 and scheduled for December 7, 1989. On December 4, 1989 without objection Rector was permitted to amend his habeas petition. In his amended petition Rector claims as an additional ground that he was not competent to stand trial for capital murder. He further asserts that his mental capacity at the trial was so diminished as to deny him the effective assistance of counsel as guaranteed by the Sixth Amendment.

There are thus only two contentions in this habeas proceeding: (1) Rector's present mental ability should prevent his execution; and (2) Rector's mental ability

at his capital murder in 1982 was so diminished that he was unable to receive the requisite assistance of counsel so as to satisfy the Sixth Amendment.

I will discuss these contentions in reverse order and initially take up the matter of whether the state court judge erred in holding that Rector was competent to stand trial in November of 1982 and able to render the requisite assistance to his counsel. Petitioner has thrust a heavy burden upon this court in asking that a determination be made of his mental condition seven years ago.

█ It must be remembered that Rector does not now contend that he had mental problems at the time he shot Officer Martin, but that problems arose thereafter as a result of a self-inflicted gunshot wound.

Six expert witnesses testified in the competency hearing on October 25, 1982 before Circuit Judge George F. Hartje. Two psychiatrists and two psychologists testified for the State. Two psychologists testified for the defense. Dr. Douglas A. Brown for the defense testified that in his opinion "Ricky is not competent to assist meaningfully in his defense of his own life in a capital case." On cross-examination he testified as follows:

Q. He still understands the nature, seriousness and consequences of his actions?

A. Yes, I believe he does.

Q. He understands the punishment?

A. He understands it in an intellectual level, yes.

PX 9, pp. 115–16.

Dr. Stevens, the other psychologist who testified for the defense, was present during the testimony of Dr. Brown. He agreed with Dr. Brown that Rector was not able to assist in his defense because of diminished mental abillity. He testified that "I think the critical thing is that he has no seeming memory for the events associated with this trial, and the report that he gives me is bizarre." (PX 9, p. 125).

The testimony that Rector was not able to assist in his own defense was flatly contradicted by the State's experts. Dr. John Anthony Hall, a psychologist, testified as follows:

A. I think he's capable of assisting in his defense. Again, he seems to be able to express himself quite openly. His defense seems to be fairly clearly stated to us that he doesn't remember anything. He was able to express that quite clearly. Oh, I believe that there is no emotional interference with his defense—with his assisting in his defense.

PX 9, p. 137.

Dr. Gregory Kaczewski, a psychiatrist, gave his opinion as follows:

Q. ... Doctor, do you have an opinion about whether or not Mr. Rector is capable of assisting his counsel in his defense of the charges now pending against him that carry with it the potential death penalty?

A. I believe that Mr. Rector is competent and is capable of assisting his defense attorney in his own defense. I did not see him as apathetic and unemotional as some of the other people have seen him.

PX 9, p. 151. Dr. Kaczewski was of the opinion that Rector was faking in some of the interviews and tests. (PX 9, pp. 156–57). He further testified as follows:

Q. Do you feel that he understands the nature of the charges and the proceedings that he's involved in right now?

A. Yes.

Q. And the seriousness of it?

A. Yes, sir.

Q. And the consequences that could potentially flow from it?

A. Yes, I do.

PX 9, pp. 161–62.

Dr. Joe Alford, a psychologist, testified as follows for the State:

Q. Let me ask you, when you were doing that, did you have occasion to discuss with him the nature of the charges that are pending against him now?

A. Yes. That was part of the—the battery was a competency screening test where I asked him about, uh, different things about the nature of the proceeding, roles people take and things like that.

Q. Did he understand?

A. It was my opinion that he had a good understanding of the nature of the charges, the consequences of what could happen to him as a result of those charges, and that he had a good understanding of what people did, you know, in fairly general terms not in really specific terms, of what people do in court.

PX 9, p. 168.

Dr. Sayed Hamed, a psychiatrist, was the last expert witness for the State. He was the principal examining psychiatrist at the Arkansas State Hospital where Rector had been referred for evaluation. His opinion is summarized in the following answer on direct examination:

My opinion is that Mr. Ricky Rector understands well the nature of the charges and the proceedings taken against him and is capable of cooperating with an attorney in a rational manner in the preparation of his defense....

PX 9, p. 181.

On the basis of this testimony, the trial judge found Rector competent to stand trial. I agree with the comments of the Supreme Court of Arkansas set out *supra*, with respect to the ruling of the trial judge. In my opinion the testimony at the October 25, 1982 competency hearing clearly preponderated in favor of the ruling of the trial judge. As the Supreme Court of Arkansas observed, the ruling of the trial judge was not "clearly erroneous." The ruling was made on a factual dispute after the trial judge heard conflicting testimony. It was affirmed by the Supreme Court of Arkansas and reviewed by the Supreme Court of the United States. The trial judge's factual finding on the competency issue falls clearly within the ambit of 28 U.S.C. § 2254(d) and is entitled to a presumption of correctness. *See Davis v. Wyrick*, 766 F.2d 1197, 1201 (8th Cir.1985).

None of the exceptions noted in this subsection are applicable. Therefore, the burden rests upon the petitioner "to establish by convincing evidence that the factual determination by the state court was erroneous." This subsection was interpreted by the Supreme Court in *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981):

Section 2254(d) by its terms thus applies to factual determinations made by state courts, whether the court be a trial court or an appellate court.... Given the applicability of 2254(d), it is apparent that the Court of appeals did not apply the "presumption of correctness" which is mandated by the statute to the actual determination made by the California state courts.

*Id.* at 547, 101 S.Ct. at 769. Two years later the Supreme Court in *Marshall v. Lonberger*, 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) was again called upon to interpret 28 U.S.C. § 2254(d):

In its treatment of the state courts' factual findings, the Court of Appeals failed in at least one major respect to accord those determinations the "high measure of deference," *Sumner v. Mata, supra,* to which they are entitled. This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even "fair support" in the record. The Court of Appeals' treatment of the issue of respondent's credibility failed to satisfy this standard....

....

... Title 28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.

*Id.* at 432, 434, 103 S.Ct. at 849, 851.

Was any evidence introduced in the hearing before me on December 7, 1989 that would impair the finding of competency made by the state trial judge? The testimony of Drs. Stevens and Brown given before me was simply a reiteration of their

previous testimony at the competency hearing on October 25, 1982. Neither had seen the petitioner since that time. The only new material called to their attention consisted of the reports from the examiner at the Springfield facility and the deposition of Dr. David Reuterfors, the principal examining psychologist. At Springfield the examination team consisted of Dr. David Reuterfors, a psychologist, Dr. James R. Leach, a psychiatrist, and a nurse. The report to me as a result of my referral of the petitioner to Springfield was signed by Reuterfors and Leach and was sent to me by the Psychiatric Service Coordinator under date of August 23, 1989. At that time the only issue being raised was whether petitioner's mental capacity was such that he could be legally executed. No issue had been raised concerning his competency in the 1982 trial. This issue was first introduced on December 4, 1989, three days before the plenary habeas hearing in my court. The contents of this report will be discussed, *infra*. It did not deal with the issue now being addressed—Rector's competency at the trial. This was made plain in the deposition of Dr. Reuterfors taken on November 21, 1989, wherein he stated:

> So the focus of subsequent interviews became his present mental function, because that is really what is most relevant to our ultimate formulation anyway, as of what is his condition now and not five years ago or ten years ago and that that's what we centered on in the subsequent interviews and that's what the psychological testing was all about, his current mental functioning.

PX 11, p. 36. On cross-examination the psychologist further clarified his answer:

Q. ... The first thing that I do want to go to is this: The reference questions that you have presented by Judge Woods, the two standards that you were asked to evaluate Mr. Rector under, you compared the second test, the ABA test, as being somewhat analogous to competency to stand trial; that is, the defendant's ability to consult with his attorneys in preparing the defense. That was not the specific question,

though, competency to stand trial, per se, was not the issue before you in this evaluation?

A. That's correct. That was just an analogy.

Q. So you're not making any kind of comment or making a suggestion about whether or not he was competent to stand trial when he was tried in 1982?

A. No, not at all.

PX 11, p. 106.

He further testified on redirect:

Q. You previously testified that you had evaluated maybe hundreds of individuals on the issue of competency to stand trial. Could you tell me what the standard was that you used in these evaluations?

A. In terms of competency to stand trial? Well, it's the basic competency standards. It's the question of whether, due to mental illness or defect, the individual understands the legal proceedings against him and is able to assist an attorney in preparing a rational defense. So it's a two-pronged standard, basically.

Q. Okay. In your opinion today would Rector be competent to stand trial?

A. I didn't evaluate Mr. Rector on that question and I don't feel it's appropriate for me to speculate in retrospect on that.

PX 11, pp. 133–34.

The other witnesses who testified before me were two former attorneys for Rector, Ron Heller and Dan Stripling, and his sister. Heller represented Rector in the first trial. His testimony was essentially the same as that given at the two competency hearings on September 28, 1981 and October 25, 1982. This testimony is abstracted in petitioner's appellate brief in the Arkansas supreme court at pages 48–51, which was introduced in evidence by agreement in the hearing before me. At the competency hearing directly involved herein (October 25, 1982), Heller did not testify in person, but it was stipulated that he would testify:

... [T]hat during that interview he particularly concerned himself with the capital aspects of the case, and particularly the issue of the presence of aggravating and mitigating circumstances and tried to develop those issues and the ones that were present in this case, and that he was unable to do so with Mr. Rector (T. 185).

That in his opinion, Mr. Rector does not understand the importance of these circumstances in his case, and does not have the ability to consider aggravating and mitigating circumstances.

RX 2A, p. 93.

Heller's testimony was considered by the state trial judge. I have also considered his testimony in the two competency hearings and in the hearing before me on December 7, 1989.

The other attorney, Dan Stripling, represented Rector in the capital murder trial under scrutiny in this proceeding. His testimony, like that of Heller, was directed toward Rector's mental condition at the time of the trial. Neither Heller nor Stripling has seen Rector since representing him. He has had other attorneys in the habeas proceedings.

The principal basis for the opinions of Heller and Stripling that Rector was not competent to stand trial was his passivity and unemotional affect along with his amnesia. "However, lack of memory is an inadequate ground for holding a defendant incompetent." *Deason v. State*, 263 Ark. 56, 562 S.W.2d 79, 81 (1978), *citing United States v. Stevens*, 461 F.2d 317 (7th Cir. 1972). "We agree with the Second Circuit that amnesia is not a bar to prosecution of an otherwise competent defendant." *Id.* at 320. *See also Davis v. Wyrick, supra* at 1202. The testimony of Rector's sister was that since his self-inflicted gunshot wound he had undergone a personality change and was now a different person. When the testimony of these three witnesses is juxtaposed against the testimony of the four highly qualified experts who testified at prior to Rector's 1982 state trial, I am not impressed.

The additional testimony and exhibits received at the the December 7, 1989 hearing before me have failed to establish that Rector was not competent to stand trial in the fall of 1982. Petitioner has fallen far short of meeting the standard required by 28 U.S.C. § 2254(d).

It is worthy of note that the jury found none of the following mitigating factors submitted for their consideration to be present:

1. The capital murder was committed while Ricky Rector was under extreme mental or emotional disturbance.

2. The capital murder was committed while Ricky Rector was acting under unusual pressures or influence or under the domination of another person.

3. Ricky Rector has undergone a significant personality change as a result of his self-inflicted gunshot wound.

4. Ricky Rector suffers from mental retardation.

5. Ricky Rector suffers from significant brain damage.

*Rector v. State*, No. CR83–39, Abstract and Appellant's Brief, Vol. 1, pp 13–14. (RX 2).

In summary, Rector has been found competent to stand trial by the trial judge, the jury, the Supreme Court of Arkansas (whose decision was reviewed *certiorari* by the Supreme Court of the United States). On the basis of the transcript of the October 25, 1982, the competency hearing transcript, the trial transcript, and the testimony and exhibits introduced before me in the hearing of December 7, 1989, I find independently that Ricky Ray Rector was competent to stand trial for the capital murder of Officer Bob Martin. In fact, I find that the evidence preponderates in favor of this conclusion.

■ The remaining issue before me is whether Rector's present mental condition is such that he may be legally executed. On this issue the only testimony having significant probative value is that of Dr. Leach and Dr. Reuterfors, the psychiatrist and psychologist, respectively, at the

Springfield, Missouri federal correctional facility, where I sent Rector for evaluation. The other witnesses who testified at the hearing before me had not seen him for six or seven years. Their opinion on his present condition was based on the reports from Springfield and the deposition of Dr. Reuterfors. Only Rector's sister had seen him recently, and I do not accord her testimony substantial weight. Although the Springfield team made an evaluation under the standards promulgated by the Supreme Court in *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) and also the American Bar Association, I am bound by the former standards. While the latter are interesting, they have no legal effect.

The evaluation by Drs. Leach and Reuterfors of the mental condition of Ricky Ray Rector in accordance with *Ford v. Wainwright, supra,* was summarized as follows:

> In each instance when Mr. Rector was interviewed, he had a basic, rational understanding of the reason why he was on death row. Mr. Rector understood that he had been convicted of a capitol [sic] offense. Mr. Rector also appeared to understand that the consequence of that conviction was that he was sentenced to die. Mr. Rector also stated on a number of occasions that he preferred to die rather than endure the conditions on death row in the Arkansas Penitentiary. In the opinions of the undersigned examiners, Mr. Rector satisfies the competency standard contained in *Ford v. Wainwright.* That is, it appears that no mental illness or defect prevents Mr. Rector from being aware of his impending execution and the reason for it.

Initial Forensic Report, p. 5, Ricky Rector, 8–8–89 (PX 1).

In his deposition Dr. Reuterfors stated:

> Q. Now we're going to get into your discussion and your opinions, and we've been—we've probably been through most of what is in here by going through the report, but you've stated two opinions based on two standards in this section of your report. Could you—on the *Ford v. Wainwright* standard that you're setting out here, could you tell me what the standard was that you were applying there?
>
> A. Well, as I understand it—and, again, this is for the Court ultimately to determine, but my understanding of that standard is whether or not the defendant, due to mental illness or defect, is unable to appreciate his situation and his impending execution and the reasons for his being sentenced to death. That's essentially my understanding of what that standard is.
>
> Q. And under that standard, your opinion was?
>
> A. In my opinion, Mr. Rector is able to meet that standard. He appreciates that he is on death row. He understands that he has been sentenced to death. He knows why the execution sentence was imposed. He understands what he was convicted of. So he has that basic rudimentary understanding of his situation. And according to that standard, I believe that he's competent.

PX 11, pp. 88–89.

In one respect the testimony from the psychologists on behalf of Mr. Rector in the hearing before me was somewhat damaging to him. They testified that based on the test and reports from Springfield and the deposition of Dr. Reuterfors, Rector's mental condition has improved since they saw him in 1982.

■ Based upon the testimony and exhibits introduced in the hearing before me on December 7, 1989, I find that Rector's mental condition is such that the State of Arkansas may legally proceed to execute him. "[T]he condemned prisoner does not enjoy the same presumption accorded a defendant who has yet to be convicted or sentenced." *Ford v. Wainwright, supra* at 411, 106 S.Ct. at 2602. But under the Eighth Amendment a state is prohibited from carrying out a sentence of death upon a prisoner who is insane. *Id.* at 410, 106 S.Ct. at 2602. When the issue is raised in a

habeas corpus petition, the U.S. District Court must hold a plenary hearing if there has not been a state procedure which accorded petitioner due process and gave him a fair and full opportunity to establish his lack of competency. Although this is a statutory procedure in Arkansas as noted, *supra*, it was not sought or applied in Rector's case. Therefore the matter was before me on a plenary *de novo* hearing to make the factual determination as to Rector's present competency. The test as laid down in *Ford v. Wainwright, supra*, is whether his "mental illness prevents him from comprehending the reasons for the penalty or its implication." *Id.* at 417, 106 S.Ct. at 2605. Justice Marshall's opinion in *Ford v. Wainwright, supra*, was a plurality opinion, and the concurrence of Justice Powell was necessary for the court's judgment. Justice Powell wrote in his concurring opinion:

> [P]etitioner does not make his claim of insanity against a neutral background. On the contrary, in order to have been convicted and sentenced, petitioner must have been judged competent to stand trial, or his competency must have been sufficiently clear as not to raise a serious question for the trial court. The State therefore may properly presume that petitioner remains sane at the time sentence is to be carried out, and may require a substantial threshold showing of insanity merely to trigger the hearing process.

*Id.* at 425–26, 106 S.Ct. at 2609–10.

Here no threshold showing of insanity was required, but petitioner was accorded a full and fair plenary hearing on the competency issue.

> Unlike issues of historical fact, the question of petitioner's sanity calls for a basically subjective judgment. (Citing cases). And unlike the determination of whether the death penalty is appropriate in a particular case, the competency determination depends substantially on expert analysis in a discipline fraught with "subtleties and nuances."

Powell, J. concurring at 426, 106 S.Ct. at 2610.

*Penry v. Lynaugh,* —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) does not aid the petitioner. The *Penry* case does not present the same issue as *Ford v. Wainwright, supra.* It was argued that Penry was so retarded mentally at the time the crime was committed that he did not have such culpability for the crime as would justify exaction of the death penalty. There is no contention that Rector was mentally impaired at the time he murdered the police officer. His alleged impairment resulted from a self-inflicted head wound a few minutes after the murder.

There is also wide disparity in the degree of impairment:

> As a child, Penry was diagnosed as having organic brain damage, which was probably caused by trauma to the brain at birth. Penry was tested over the years as having an IQ between 50 and 63, which indicates mild to moderate retardation. Dr. Brown's own testing before the trial indicated that Penry had an IQ of 54. Dr. Brown's evaluation also revealted that Penry, who was 22 years old at the time of the crime, had the mental age of a 6½ year old.

*Penry v. Lynaugh, supra,* —— U.S. at ——, 109 S.Ct. at 2941. Rector's IQ on the other hand was found to be 70 by the examining psychologist at Springfield. (Dep. of Dr. Reuterfors, p. 70). This places Rector right at the dividing line for mental retardation. As Justice O'Connor noted in footnote 1:

> Under the AAMR [American Association of Mental Retardation] classification system, individuals with IQ scores between 50–55 and 70 have "mild" retardation. Individuals with scores between 35–40 and 50–55 have "moderate" retardation. "Severely" retarded people have IQ scores between 20–25 and 35–40 and "profoundly" retarded people have scores below 20 or 25.

*Penry v. Lynaugh, supra,* —— U.S. at ——, 109 S.Ct. at 2941. While Penry was "mildly" or "moderately" retarded, according to the above classification system, there is a question whether Rector is retarded at all. As stated in the report of the

Springfield examiner: "The patient received a verbal intelligence quotient of 69, a performance intelligence quotient of 74, and full scale intelligence quotient of 70. This full scale intelligence quotient placed Mr. Rector right at the cut off for mental retardation." (PX 1, p. 3).

The Springfield evaluation is the only current assessment of Rector's mental condition. Except for petitioner's sister, none of the witnesses at the habeas hearing had seen him for seven years. Although *Penry* does not deal with the issue here presented, there is language in Justice O'Connor's separate opinion in Part IV(c) which hardly gives comfort to petitioner:

> In sum, mental retardation is a factor that may well lessen a defendant's culpability for a capital offense. But we cannot conclude today that the Eighth Amendment precludes the execution of any mentally retarded person of Penry's ability convicted of a capital offense simply by virtue of their mental retardation alone. So long as sentencers can consider and give effect to mitigating evidence of mental retardation in imposing sentence, an individualized determination of whether "death is the appropriate punishment" can be made in each particular case.

*Id.* at 34.

In Rector's case the sentencers considered and gave effect to mitigating evidence of mental retardation in imposing sentence. As Justice O'Connor noted: "A number of states explicity mention 'mental defect' in connection with such a mitigating circumstance." *Id.* at 31. This statement is footnoted to the statutes of ten states, including Ark.Code Ann. § 5–4–605(3). The statute was scrupulously followed in Rector's case by the instructions to the jury, as noted *supra*. The reason for the remand in *Penry* was that the jury was given no opportunity to consider Penry's mental impairment as a mitigating circumstance. In the Rector case the jury was fully accorded this opportunity.

In summary, my findings of fact are as follows:

(1) There was abundant evidence in support of the trial judge's determination that Rector was competent to stand trial for the murder of Officer Bob Martin.

(2) On the basis of my own independent review of the evidence presented in the state court proceedings and at the habeas hearing before me, I find that Rector was competent to stand trial in November of 1982.

(3) I find that the petitioner is aware of the punishment, its implications, and the reasons he is about to suffer it.

(4) I further find that Rector has a basic, rational understanding of the reason why he has been sentenced to death and why he is presently on death row as a result of being convicted of a capital offense.

I have also arrived at the following legal conclusions:

(1) The result of the competency hearing in state court is entitled to the presumption of correctness under *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) and *Davis v. Wyrick*, 766 F.2d 1197 (8th Cir.1985).

(2) The petitioner's Sixth Amendment Rights were not violated in the state court proceedings. Petitioner was at all times represented by able and conscientious counsel and has been mentally able to assist them in his defense.

(3) The petitioner's present mental condition satisfies the standards of *Ford v. Wainwright, supra*, and his execution would not offend the Eighth Amendment.